```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Lisa Lou Russell,                   :

    Plaintiff,                  :

  v.                                :     Case No.  2:15-cv-0407

Carolyn W. Colvin, Acting           :     JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,          Magistrate Judge Kemp

    Defendant.                  :


                    REPORT AND RECOMMENDATION
                       I.  Introduction

    Plaintiff, Lisa Lou Russell, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for supplemental security income.  That application was filed on June 6, 2011, and alleged that Plaintiff became disabled on January 31, 1998.  That date was amended, at the hearing, to June 6, 2011.

    After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on June 6, 2013.  In a decision dated August 16, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on December 5, 2014, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on April 13, 2015.  Plaintiff filed her statement of specific errors on June 15, 2015, to which the Commissioner responded on September 16, 2015.  Plaintiff filed a reply brief on September 30, 2015, and the case is now ready to decide.

    II.  The Lay Testimony at the Administrative Hearing

    Plaintiff, who was 25 years old at the time of the

administrative hearing and who discontinued her schooling in 9th grade, testified as follows. Her testimony appears at pages 34-49 of the administrative record.

Plaintiff first testified that she failed to complete the ninth grade after attempting it three or four times. She had been in special education classes since third or fourth grade. Plaintiff said she could write a little bit but could not read. She had never had a driver's license and had never lived independently, nor had she ever had a checking account. She had two children, but they were in their father's cousins' custody.

In the past, Plaintiff had received mental health counseling, but stopped treatment when she got angry at her counselor. She had worked at three or four jobs in the past, the last one being at Taco Bell. That job ended when she hit a co-worker. A similar incident ended her employment at McDonald's after only two days. She also lost a factory job after four weeks due to a confrontation with her manager.

Plaintiff was asked about drug use, and said that she had been using marijuana to help her cope with various life events. She had also used heroin, but only once since June of 2011. She had never been in a drug treatment program.

On a typical day, Plaintiff awoke angry. She had attempted suicide in January, 2013. She had no daily activities and did no household chores. She never saw her children. Her father accompanied her whenever she left the house. Being around other people brought on symptoms of anxiety. That was the primary reason she could not work. She did take medication, and it helped her not to cry every day and calmed her down.

### III. The Medical and Educational Records

The medical records in this case are found beginning on page 295 of the administrative record. The Court will summarize those records, as well as the opinions of the state agency reviewers,

to the extent that they are pertinent to Plaintiff's single statement of error.

Dr. Sarver, a clinical psychologist and neuropsychologist, conducted a consultative evaluation on July 20, 2011. At that time, Plaintiff was living either with a boyfriend or with her grandmother. At some time previously, she had been homeless. She also had run away from home and been suspended from school on multiple occasions. She reported never having had friends. She was using marijuana one day per week. At that time, she was doing household chores, and she also watched television. She had no hobbies.

Dr. Sarver noted that Plaintiff reported being depressed and that she appeared socially awkward. She had no difficulty with attentional pace and persistence and her memory was intact, but she showed difficulty reading and writing. Her abstract reasoning was in the mentally retarded range, as was her common sense and judgment. On tests administered during the evaluation, Plaintiff scored 68 on the verbal comprehension component of an IQ test, 56 on the perceptual reasoning component, 63 on the working memory component, and 65 on processing speed component, yielding a full-scale IQ score of 57. That placed her overall intellectual functioning in the mentally retarded range. Dr. Sarver said the test results were valid. He did say, however, that "her independent living skills appear to be functional, and she has no history of special education placement." He rated her GAF at 55 and diagnosed adjustment disorder with depressed mood, a personality disorder, and borderline intellectual functioning. He also thought she would have some difficulty following even simple job instructions and that she would "consistently encounter contentious relationships with supervisors and coworkers in the work setting." She also would have difficulty dealing with work pressure. (Tr. 306-14).

There are a number of other treatment records, primarily from Tri-County Mental Health. Because these records do not relate directly to the claim Plaintiff raises here, the Court will not summarize them.

Plaintiff submitted records from Trimble High School, where she attended the ninth grade. She had an IEP in place which noted that she qualified for "special education with a specific learning disability that effects (sic) her performance in all areas of academic achievement." Her reading and comprehension were below a third grade level and her writing was at a fifth or sixth grade level. She was retained multiple times in the eighth and ninth grades and never successfully completed any coursework in the ninth grade. She was also suspended multiple times for violating various school rules and for being defiant and disrespectful.

Finally, the state agency psychological reviewers (neither of whom had seen the school records) assessed Plaintiff's mental residual functional capacity, finding her moderately limited in a number of work-related areas. Neither diagnosed mental retardation, and although each appears to have rejected the contention that Plaintiff met the criteria for disability under section 12.05(C) of the Listing of Impairments, neither provided any particular explanation for that conclusion.

## IV. The Vocational Testimony

Karen Frazier White, a vocational expert, testified at the administrative hearing. Her testimony begins at page 50 of the administrative record.

Ms. White began by testifying about Plaintiff's past relevant work. She said that jobs like fast food worker and assembly line worker were unskilled, with the fast food worker job typically being performed at the light exertional level, and the assembly line job being performed at all exertional levels,

although Plaintiff's assembly job was sedentary.

Ms. White was then asked to answer some questions about a hypothetical person who could work at all exertional levels and who was limited to doing simple, routine, repetitive tasks involving only no decision-making, no production quotas, no tandem tasks, no interaction with the general public, and only occasional interaction with coworkers and supervisors. According to Ms. White, such a person could do Plaintiff's past work as an assembly line worker. Such a person could also work as a busser, cleaner, or laundry worker. If the person also could not be required to read instructions, write reports, or do math calculations, he or she could still do the latter two jobs plus a job as a laundry bagger. Ms. White also said that none of those jobs involved over-the-shoulder supervision.

Ms. White was then asked if certain restrictions would be work-preclusive. She testified that someone who could not sustain sufficient concentration to do even simple tasks for an eight-hour day could not be employed, nor could a person who could not consistently and appropriately interact with co-workers and supervisors. The same was true for someone who consistently missed as many as three or four days of work per month.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11-20 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since her application date of June 6, 2011. Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including depression, anxiety, personality disorder, borderline intellectual functioning, and substance abuse disorder. The ALJ also found that these

impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1), including sections 12.04 and 12.06.

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels but was limited to the performance of simple routine tasks involving simple, short instructions with no decision-making, few workplace changes, no production requirement, no tandem tasks, no interaction with the general public, and occasional interaction with supervisors. Also, she should not be required to read instructions, write reports, or perform math calculations.

The ALJ next found that Plaintiff had no past relevant work. Nevertheless, the ALJ concluded that Plaintiff could work as a busser or laundry bagger, and that these jobs existed in significant numbers in the region and nationally. Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises only a single issue. She asserts that the ALJ erred in her analysis of the requirements of section 12.05(C) of the Listing of Impairments. This issue is considered under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th

-6-

Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

   In order for a claimant to qualify for disability under section 12.05(C) of the Listing of Impairments, the claimant must meet both the criteria for mental retardation and have another impairment which significantly limits his or her ability to perform work-related functions. Section 12.05 sets forth certain qualifying scores on IQ tests which must be achieved in order to demonstrate mental retardation. For subsection (C), it is a valid verbal, performance, or full-scale IQ score between 60 and 70. However, such a score is not sufficient to prove the existence of mental retardation. According to the preamble to that Section, the claimant must also demonstrate deficits in adaptive functioning which manifested themselves prior to age 22. If that evidence is absent, the Listing has not been satisfied. See Brown v. Secretary of H.H.S., 948 F.2d 268 (6th Cir. 1991).

   The ALJ appeared to find that Plaintiff had no condition meeting the criteria of any portion of the Listing of Impairments, including section 12.05(C). As Plaintiff frames the

-7-

issue, the question is whether the ALJ's determination that her mental retardation did not meet section 12.05(C) is supported by substantial evidence.  In arguing that it was not, Plaintiff contends that the ALJ stated incorrectly that she had no other severe impairments, improperly dismissed or failed to acknowledge the qualifying IQ scores produced by the tests administered by Dr. Sarver, and incorrectly determined that Plaintiff did not have deficits in adaptive functioning which manifested themselves prior to age 22.

The ALJ's step three finding is not a model of clarity.  The Court quotes it in full, as it relates to section 12.05(C), as the starting point of the analysis:

> [T]he "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Although the claimant was determined to have a learning disability, there is no evidence the claimant had intellectual disability or significant deficits in adaptive functioning prior to age 22 (Exhibit 10E).  Although Dr. Sarver's testing indicated low IQ scores, medical evidence of record indicates average intelligence (Exhibits 3F and 6F, p. 7).  Also the signature of a state agency medical consultant on Form SSA-831 is implicit recognition that the consultant has considered and ruled out a finding that a medical listing is equaled (Exhibits 2A and 4A). ... No treating or examining physician has either offered an opinion or reported findings of listing level severity.  In addition, the undersigned has carefully reviewed the criteria of the listed impairments in Appendix 1 and has determined that the claimant's impairment (sic) do not meet the listing level criteria of any impairments in Appendix 1.

(Tr. 15).

The first sentence of the ALJ's rationale is both a simple restatement of all of the criteria set out in section 12.05(C)(excluding the existence of deficits in adaptive

functioning manifesting themselves prior to age 22, which is found in the preamble) and, as to those criteria, demonstrably false.  The ALJ herself found that Plaintiff had other severe impairments, including depression, anxiety, and a personality disorder.  Consequently, if the first sentence is read to say that Plaintiff did not meet that part of the criteria, it is contradicted by the ALJ's own findings.

As to the IQ scores, the only evidence as to their validity is Dr. Sarver's comment that they were valid.  The ALJ gave "special weight" to Dr. Sarver's opinion, Tr. 18, and never explained why (or whether) the ALJ considered all of his test scores to be invalid.  Dr. Sarver's report confirmed the fact that there were no psychological factors affecting Plaintiff's performance on the tests, and also that Plaintiff's overall level of intellectual functioning, the skills which the tests addressed, her abstract reasoning, and her common sense and judgment, all fell within the mentally retarded range.  This is not a case like Daniels v. Comm'r of Social Security, 70 Fed.Appx. 868, 869, 872 (6th Cir. 2003), where the test findings "were undermined by a doctor's full evaluation," see Dragon v. Comm'r of Social Security, 470 Fed.Apx 454, 462 (6th Cir. March 26, 2012); quite the contrary.  Thus, either the ALJ did not actually find the test scores themselves to be invalid (which is the more reasonable interpretation of the record, given that the ALJ never discussed any factors which bear on the validity of IQ test scores), or made such a finding without substantial support in the record.  The Commissioner's argument that the scores might be deemed invalid based on the fact that one other document in the record - a treatment note from Tri-County on which a box is checked estimating Plaintiff's intellectual functioning as "average," Tr. 362 - suggests a higher level of functioning is misplaced.  That form is hardly the type of evidence upon which otherwise valid IQ scores can be completely disregarded.  It is

simply not a reasonable interpretation of the record that the ALJ credited this form over the view of Dr. Sarver, whose report the ALJ gave great weight to, but even if that was what happened, that finding lacks substantial support. In short, the first sentence of the operative paragraph quoted above is nothing more than the ALJ's finding that (1) there are multiple criteria which have to be met in order to establish disability under section 12.05(C), and (2) Plaintiff did not meet them. The specific reason why the ALJ reached that conclusion has to be gleaned from the remainder of the paragraph.

The Court interprets the ALJ's reasoning as follows. Plaintiff did not satisfy section 12.05(C)'s requirements because (1) she did not, according to her school records, have "intellectual disability or significant deficits in adaptive functioning prior to age 22"; and (2) no physician or state agency reviewer said she satisfied section 12.05(C). The latter statement is true, but neither of the state agency reviewers had the benefit of the educational records, and neither performed a specific analysis of the requirements of that section of the Listing. That rationale therefore fails the substantial evidence test. What is left is the conclusory statement, based upon a single reference to the educational records, that Plaintiff did not, before she turned 22, have the type of deficits in adaptive functioning which support a finding of mental retardation.

By definition, the type of "intellectual disability" addressed by section 12.05 "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." The phrase "adaptive functioning" has been fleshed out by the Court of Appeals, which said:

> The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills. Heller v. Doe, 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d

-10-

> 257 (1993) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 28-29 (3d rev. ed. 1987) ("DSM-III")).  To determine the definition of mental retardation under the SSA, it is appropriate to consult leading professional organizations' definitions. See 67 Fed.Reg. 20022 (2002). The American Psychiatric Association defines adaptive-skills limitations as "[c]oncurrent deficits or impairments ... in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV-TR at 49.

Hayes v. Comm'r of Social Security, 357 Fed. Appx. 672, 677 (6th Cir. Dec. 18, 2009).

The ALJ cited to Plaintiff's school records as evidence that she did not, while growing up, have any issues either of intellectual disability or adaptive functioning.  However, those records do show significant problems in the area of "functional academic skills," which is, under Hayes, an aspect of adaptive functioning.  Her performance in school, particularly in eighth and ninth grades, was woefully deficient, she did not read at a grade-appropriate level, and her other academic skills were problematic.  The Commissioner suggests that her academic problems were due to a specific learning disability as opposed to "cognitive disability," see Memorandum in Opposition, Doc. 17, at 7, but does not explain how the two are different, or whether any difference is significant for the section 12.05(C) analysis.  In any event, the ALJ did not draw that distinction, but seemed to conclude that the school records did not support a finding of academic problems while Plaintiff was growing up.  That is not a reasonable inference to draw.  Further, the records clearly demonstrate socialization issues and, to some extent, issues with self-direction.  It is one thing to attribute these to some other cause (such as Plaintiff's diagnosed personality disorder); it is another thing to say, as the ALJ did here, that these issues did

not exist at all, and to support that statement by referring to records which contradict it. Consequently, the Court finds that the ALJ did not have or cite to a reasonable basis for her decision that there were no deficits in intellectual or adaptive functioning prior to age 22.

The Commissioner devotes a substantial amount of argument to the fact that Dr. Sarver did not diagnose mental retardation and that the school records, which he did not have access to, would not have changed his mind. Dr. Sarver's report, while it makes multiple references to the fact that Plaintiff functioned in the mentally retarded range, also explained that he did not diagnose mental retardation because there was "no apparent history of special education placement." (Tr. 312). Dr. Sarver did not, however, have the actual educational records, and it is simply speculative to suggest that they would not have affected his views. In any event, the actual diagnosis of mental retardation is not determinative, and the ALJ did not provide that rationale in her decision. Here, the proper course is to remand the matter to the ALJ so that the full record can be evaluated properly.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained and that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper

objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge